JASON E. GOLDSTEIN (Florida Bar No.: 526991)
STEVEN BROWER (California Bar No.: 93568)
(*Motion For Limited Appearance Filed Herewith*)
**BUCHALTER NEMER**
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: (949) 760-1121
Facsimile: (949) 720-0182
Email: sbrower@buchalter.com
          jgoldstein@buchalter.com

Attorneys for Plaintiff
NATIONAL CONTRACTORS INSURANCE
COMPANY, INC., A RISK RETENTION GROUP

FILED by ASS D.C.
NOV 24 2009
STEVEN M. LARIMORE
CLERK U.S. DIST. CT
S. D. of FLA. – MIAMI

09-23558

CIV-UNGARO

MAGISTRATE JUDGE
SIMONTON

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

NATIONAL CONTRACTORS
INSURANCE COMPANY, INC., A
RISK RETENTION GROUP,

  Plaintiff,

vs.

CONTRACT WORKS CORP., F.H.
PASCHEN, S.N. NIELSEN &
ASSOCIATES, LLC,

  Defendants.

CASE NO.:

**COMPLAINT FOR DECLARATORY JUDGMENT**

**[DEMAND FOR TRIAL BY JURY]**

Plaintiff National Contractors Insurance Company, Inc., a Risk Retention Group ("NCIC"), by way of its Complaint against the defendants, hereby alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendants, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2. Venue is proper in the United States District Court for the Southern District of Florida pursuant to, inter alia, 28 U.S.C. §§ 1391 et seq., and particularly subsection (a)(2), because this is the district in which a substantial part of the events, acts or

omissions giving rise to the within claims occurred. Further, Defendant Contract Works Corp. ("Contract Works"), NCIC's insured, has its principal place of business in Dade County, Florida.

## THE PARTIES

3. NCIC is, and at all times herein mentioned was, a corporation duly organized and existing under and by virtue of the laws of Montana, with its principal place of business in Orange County, California. NCIC is a risk retention group pursuant to 15 U.S.C. § 3902.

4. NCIC is informed and believes, and therefore alleges, that Defendant Contract Works is, and at all times herein mentioned was, a corporation duly organized and existing under and by virtue of the laws of Florida, with its principal place of business in Dade County, Florida.

5. NCIC is informed and believes, and therefore alleges, that Defendant F.H. Paschen, S.N. Nielsen & Associates, LLC ("Paschen") is, and at all times herein mentioned was, a limited liability company duly organized and existing under and by virtue of the laws of Illinois, with its principal place of business in Cook County, Illinois.

## GENERAL ALLEGATIONS

### The Issuance Of The NCIC Insurance Policy

6. NCIC is informed and believes, and therefore alleges, that on or about June 18, 2009, a Full Application (the "Full Application") was submitted to NCIC in support of a request for issuance of a general liability insurance policy for Contract Works.

7. NCIC is informed and believes, and therefore alleges, that the Full Application was prepared and/or handled by one or more insurance brokers acting on behalf of Contract Works. The insurance brokers were acting on behalf of Contract Works and were not agents authorized to act on behalf of NCIC. For the purposes of allegations in this Complaint, when references are made to representations and/or

statements by Contract Works to NCIC, these representations and/or statements include those made by the insurance brokers acting on behalf of Contract Works.

8. The Full Application was signed by Steve J. Martinez ("Mr. Martinez"). NCIC is informed and believes, and therefore alleges, that Mr. Martinez is the President of Contract Works. By signing the Full Application, Mr. Martinez, on behalf of Contract Works, adopted and ratified everything in the Full Application.

9. One of the items that called for a response in the Full Application was a question which asked: "Have You Performed During the Past 3 Years and/or Do You Plan to Perform in the next 12 Months Any Work Involving the Following: . . . Demolition." Next to the term "Demolition" were boxes where a check-mark could be placed for a response of either a "yes" or "no." Contract Works check-marked the box "no" with respect to this question.

10. Another portion of the Full Application instructed the applicant to fill in "blanks" next to certain categories of work, with the percentages allocated equaling a total of 100%. One such section included the following four choices: "New Construction," "Remodeling," "Service/Repair" and "Demolition." In response, Contract Works assigned 50% to "New Construction" and 50% to "Remodeling." Contract Works expressly did not allocate any percentage to the box for "Demolition."

11. On page 1 of the Full Application, the written instructions required Contract Works to respond to an inquiry which stated: "Please Provide Specific Details on All Past Losses: _____" Contract Works responded by filling in the blank space with: "No Known Loss Letter." NCIC is informed and believes, and therefore alleges, that this is a term of art in the insurance industry and is a reference to a document entitled "Loss Warranty Letter" provided to NCIC by Contract Works in connection with the underwriting of the NCIC Insurance Policy that was ultimately issued to Contract Works. A true and correct copy of the Loss Warranty Letter is attached hereto as Exhibit "2" and is incorporated herein by this reference as if set forth in full.

12. NCIC is informed and believes, and therefore alleges, that the Loss Warranty Letter was signed by Mr. Martinez, the President of Contract Works. It states that Contract Works: 1) has not sustained any losses; 2) has not had any claims made against it; 3) has not been denied insurance coverage or had an insurance policy cancelled; and 4) has no knowledge of any reason to anticipate a claim or loss.

13. The Loss Warranty Letter confirmed that it "will be incorporated into the insurance contract" and specifically stated that:

> Warranty: The purpose of this no loss letter is to assist in the underwriting process. Information contained herein is specifically relied upon in determination of insurability. The undersigned, therefore, warrants that the information contained herein is true and accurate to the best of his/her knowledge, information and belief. <u>This no loss letter shall be the basis of any insurance that may be issued and will be a part of such policy. It is understood that any misrepresentation or omission shall constitute grounds for immediate cancellation of coverage and denial of claims, if any.</u> It is further understood that the applicant and or affiliated company is under a continuing obligation to immediately notify his/her underwriter throught [sic] his/her broker of any material alteration of the information given. [Emphasis added]

14. In reliance on the representations made within the Full Application and Loss Warranty Letter, on June 17, 2009, NCIC issued a commercial general liability insurance policy, number GLF00011481-01, effective June 17, 2009 to June 17, 2010, to Contract Works (the "NCIC Insurance Policy"). A true and correct copy of the NCIC Insurance Policy (which includes the Full Application) is attached hereto as Exhibit "1" and is incorporated herein by reference as though set forth in full.

15. NCIC, like many other insurers, charges different premiums for different risks. As to Contract Works, the rates were applied based on the anticipated gross revenue reported on the Full Application. The Full Application indicated that Contract Works expected gross revenue would be $25,000 in the next year for "flooring" and $25,000 in the next year for "painting-exterior."

### The Jackson Memorial Hospital Project

16. Contract Works entered into a Subcontract Agreement ("Subcontract") with Paschen, dated August 27, 2009, to perform, among other things, demolition, with respect

to the interior of a building on the Jackson Memorial Hospital campus ("Jackson Memorial"). A true and correct copy of the Subcontract is attached hereto as Exhibit "3" and incorporated herein by this reference as if set forth in full. Specifically, the Subcontract provided in "Schedule A" that Contract Works' scope of work was:

> Provide all necessary supervision, labor, materials and equipment to complete the temporary construction facilities, demolition, layout, framing, insulation, drywall, soffits, acoustical ceiling and other components contained in this agreement, as indicated on the contract documents and/or as required by field conditions, specifically, but not limited to specification section(s):
>
> - Loading of demolished items and trash associated with work
>   - Long distance: weekends/week nights
> - Hauling and disposal of demolished items and trash associated with work
> - Anti-Room Set-Up, furnish and set-up the following:
>   - Negative Air temporary/containment wall
>   - (2) two cases of sticky mats
>   - Permanent floor protection in ante room, masonite
>   - FHP to supply Negative Air pressure gauge, Negative Air Pressure Scrubber and Visqueen
> - Protection of elevators during Contract Works Corporation's demolition scope of work
> - Demolition of designated dry-walled areas
> - Removal of existing doors, frames and hardware
> - Removal of existing millwork
> - Demolition of the existing bathrooms
> - Removal of fixtures/accessories/Partitions and plumber to cap
> - Demolish of CMU and lathe and plaster walls, as indicated on plans and clarified in the field
> - Demolition of existing Concrete Curbs in corridors

- Removal of existing specialty items such as signs, eye testing station, etc.
- Provide fire retardant backing for all millwork
- Provide blocking for fire extinguisher, toilet accessories, cabinets, shelving, television, bumper rails, door hardware, etc.
- Provide Gypsum board ceiling in various rooms, including bathrooms, isolation lab, medical storage, soil utility rooms, and soffited areas
- Metal Studs and Drywall
    - In addition to the drawings, furnish and install drywall over the existing perimeter walls to facilitate the installation of electrical, telecom and other devices.
    - Framing, drywall, insulation to be finished to underside of structure, where indicated on the plans.
    - 1 HR Fire Rated wall on North walls need patch work at entrance and where wall demolition occurs.
    - West wall shared with adjacent space needs to be extended to the underside of the structure, as indicated on the plans. Walls need patch work where wall demolition occurs.
- Provide sound attenuation insulation for all wall types, excluding exterior walls
- Provide 2x2 Acoustical Ceiling Tiles and grid system, two different kinds, per the plans
    - Acoustical Tile
        - Remove and replace the existing acoustical tile in adjacent spaces including all floors, as required, to facilitate access to the proposed plumbing, HVAC and electrical work required for this project.

17. The Subcontract also contains "Schedule B" which is a list of specific pages of architectural plans which were to be consulted and followed by Contract Works with respect to its work at Jackson Memorial (the "Contract Plans"). The Contract Plans

included, but were not limited to, sheet D-2.0, entitled, "Second Floor Demolition Plan," and sheet FP-1.1, entitled, "Second Floor Fire Protection."

18.     NCIC is informed and believes, and therefore alleges, that architectural plans for the subject renovation work at Jackson Memorial had originally been prepared in or about August, 2008. However, revisions to those plans were required based on changes in the scope of work requested by the owner, based on changes requested by the applicable building authorities, and/or based on actual circumstances observed at the project site. The version of the plans which became the Contract Plans were revisions dated June 19, 2009. The revisions to the original plans were indicated, on the Contract Plans, by a distinctive loop that was placed around the revised portions.

19.     In the General Demolition Notes section of sheet D-2.0 of the Contract Plans, item 26 had the distinctive loop around it and stated:

> "ALL ACOUSTICAL CEILING GRIDS AND TILES, FINISHED FLOORING AND BASEBOARD HAS BEEN REMOVED DURING THE ASBESTOS ABATEMENT. <u>THERE IS NO FLOORING OR CEILING DEMOLITION REQUIRED FOR THIS SCOPE OF WORK</u>, IT HAS ALREADY BEEN COMPLETED BY OTHERS." [Emphasis added]

20.     In the General Notes section of sheet FP-1.1 of the Plans, the General Notes, in their entirety, also had the distinctive loop around it and stated in pertinent part that:

> "1.   JMH EXISTING DRAWINGS ARE INCOMPLETE. AREAS OF BUILDING ARE MISSING. CONTRACTOR TO FIELD VERIFY EXACT LOCATION OF FIRE MAIN AND SPRINKLER HEADS. VERIFY FOR DRAWINGS.
>
> 2.   CAP & PREP. EXISTING FIRE MAIN FOR FUTURE RECONNECTION

### Contract Works Hires A Demolition Crew To Perform The Demolition Services That Allegedly Cause Water Damage To Jackson Memorial Hospital

21.     NCIC is informed and believes, and therefore alleges, that Contract Works, after entering into the Subcontract with Paschen, contracted with Darcy Hogan ("Mr. Hogan") to act as superintendant for the demolition portion of the project based, at least in part, on his prior experience and his ability to supervise, control, organize and implement demolition. Contract Works, either through Mr. Hogan, or on its own, also

contracted with three or four other persons, which included Mr. Hogan's wife, to work with Mr. Hogan on the demolition portion of the project at Jackson Memorial. This group of independent contractors shall collectively be referred to as the "Demolition Crew."

22. No member of the Demolition Crew was an employee of Contract Works.

23. NCIC is informed and believes, and therefore alleges, that the Demolition Crew, sometime prior to September 17, 2009, began the work of demolishing the interior walls at Jackson Memorial, in accordance with the Subcontract.

24. On September 17, 2009 the Demolition Crew had returned to Jackson Memorial to continue with its demolition services. While the Demolition Crew was using a combination of chipping, then whacking with a sledgehammer, the top section of a wall cracked and fell down and took a fire sprinkler line with it. The fire sprinkler line broke and water began to escape.

25. NCIC is informed and believes, and therefore alleges, that the Demolition Crew immediately notified the General Contractor, Paschen, which in turn, notified Jackson Memorial. However, due solely to the negligence of Paschen and/or Jackson Memorial, neither of them was able to locate the fire main or other fire sprinkler shutoff, even though this was a condition of the Plans as alleged in paragraph 20, above.

26. NCIC is informed and believes, and therefore alleges, that at some point in time thereafter, the fire department arrived at Jackson Memorial. However, the fire department was also not immediately able to locate the fire main or other fire sprinkler shut-off. It was not until approximately two hours after the water first began to escape that the parties were able to determine a means to stop the flow of water from the fire sprinkler.

27. The hospital building suffered water damage. NCIC is informed and believes, and therefore alleges that the cost to repair the water damage to Jackson Memorial, which is continuing at this time, is in excess of $600,000.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)
### (Against Contract Works and Paschen)

28. NCIC realleges and incorporates herein by reference, as though set forth in full, paragraphs 1 through 27 of this Complaint.

29. As alleged above, Contract Works was hired by Paschen to perform demolition and remodeling services at Jackson Memorial pursuant to the Subcontract. In turn, Contract Works contracted with the Demolition Crew to perform the demolition portion of its services at Jackson Memorial, based, at least in part, on Mr. Hogan's prior ability and experience in the area of demolition.

30. NCIC is informed and believes, and therefore alleges, that no officer, director or employee of Contract Works performed any demolition services at Jackson Memorial.

31. NCIC is informed and believes, and therefore alleges, that no officer, director or employee of Contract Works was present at Jackson Memorial at the time of the incident.

32. NCIC is informed and believes, and therefore alleges, that no officer, director or employee of Contract Works provided the Demolition Crew with any training regarding the demolition services that were performed.

33. NCIC is informed and believes, and therefore alleges, that no officer, director or employee of Contract Works was supervising the demolition services that were performed by the Demolition Crew and that no officer, director or employee of Contract Works controlled the manner in which the demolition services were performed by the Demolition Crew.

34. The Restatement (Second) Of Agency § 220 (1958) which is accepted in Florida and which is consistent with Florida's statutes and case law, sets out the following factors to be considered in determining whether a person is an employee or an independent contractor:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or workman supplies the instrumentalities, tools and a place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by time or job;

(h) whether or not the work is part of the regular business of the employer;

35.  NCIC is informed and believes, and therefore alleges, that Contract Works, among other things: 1) contracted with the Demolition Crew solely for the purpose of performing the demolition work at Jackson Memorial and not for any other work on behalf of Contract Works at that time; 2) did not provide any training to the Demolition Crew because the Demolition Crew was retained due to their previous knowledge and experience in the area of demolition; 3) was not present at the jobsite while demolition was being performed; 4) did not provide any additional supervision of the demolition, except as provided through the Demolition Crew; 5) did not control the manner in which the Demolition Crew performed their demolition services; and 6) did not perform demolition services as a regular part of its business (see paragraphs 9 and 10 above).

36.  NCIC is informed and believes, and therefore alleges, that Contract Works agreed to provide the Demolition Crew with compensation in the form of a gross payment amount, did not require the demolition crew to prepare time cards, did not provide the demolition crew with scheduled breaks, did not report the demolition crew as employees for the purpose of worker's compensation, did not control the work hours of the demolition crew (other than as required by the Subcontract) and intended to issue one or more members of the Demolition Crew an IRS Form 1099. Form 1099 is the form that is

utilized to report compensation to independent contractors. In contrast, a W-2 is the form utilized to report income to employees.

37. The members of the Demolition Crew are therefore independent contractors as to Contract Works.

38. The NCIC Insurance Policy contains two separate Independent Contractor Exclusions, which state as follows:

> **g. Independent Contractor Exclusion**
>
> <u>This insurance does not apply to</u> "bodily injury", "personal injury", "advertising injury" or <u>"property damage" arising out of the actions or failure to act of any independent contractor working by, for, with or under any "insured."</u> This insurance does not apply to "bodily injury", "personal injury", "advertising injury" or "property damage" arising out of the negligent hiring, employment, retention, instruction, supervision, oversight, training, monitoring of any independent contractor by any "insured" or for any "insured" who was or is responsible for the actions or failure to act of any such independent contractor working by, for, with or under any "insured." <u>This exclusion does not apply if and only if "you" obtained each of the following from each independent contractor prior to commencing any of "your work":</u> (A) A written indemnity agreement from each independent contractor performing labor or services on "your" behalf on or for "your work" wherein the independent contractor agreed to defend, indemnify and hold "you" harmless for all loss, damages, costs and expenses, including retaining and paying for an attorney to appear on "your" behalf in respect to any "claim" or "suit" against "you" arising out of the independent contractor's work for "you" and (B) Certificates of insurance from each independent contractor performing labor or services on "your" behalf on or for "your work" listing "you" as a named additional insured with limits of liability equal to or greater than those provided under this insurance policy and a copy of the Declarations page of the insurance policy identified in the certificate of insurance. The insurance provided by each independent contractor must be primary to this insurance and this insurance shall always be excess to any other insurance available to "you" as well as to each "insured" <u>This Independent Contractor Exclusion will apply, and "we" will not provide you with a defense nor will we indemnify you, if the independent contractor's insurer does not agree to defend you against the allegations in any "suit" even though "you" have complied with Sections (A) and (B) above.</u> [Emphasis added]

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
IRVINE

BN 4668856v3

11

**COMPLAINT**

> **gg. Independent Contractors Exclusion**
>
> <u>This insurance does not apply to</u> "bodily injury" or <u>"property damage" arising out of:</u>
>
> **(1)** <u>The acts or omission of independent contractors while working for or on behalf of "you" or any "insured" or</u>
>
> **(2)** The spouse, child parent, brother or sister of such independent contractor or "employee" of the independent contractor as a consequence of (1) above, or
>
> **(3)** <u>The negligent: **(a)** hiring or contracting; **(b)** investigation; **(e)** supervision; **(d)** training; or **(e)** retention of any independent contractor for whom "you" and or any "insured" is or ever was legally responsible and whose acts or omissions would be excluded by (1) above.</u>
>
> This exclusion applies whether "you" and or any other "insured" may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury or damage. [Emphasis added]

39.   In order to qualify for the exception to Exclusion (g), Contract Works was required to obtain, prior to the Demolition Crew commencing work at Jackson Memorial, certificates of insurance naming Contract Works as a named additional insured on each member of the Demolition Crew's general liability insurance policies, as well as indemnity agreements in its favor from each member of the Demolition Crew.

40.   NCIC is informed and believes, and therefore alleges, that Contract Works did not obtain the requisite certificates of insurance naming it as a named additional insured on each member of the Demolition Crew's general liability insurance policies prior to commencing work at Jackson Memorial, nor did Contract Works obtain the requisite indemnity agreements. Since Contract Works does not qualify for the exception to the Independent Contractors Exclusions, there is no coverage for the alleged damage to Jackson Memorial under the NCIC Insurance Policy.

41.   Paschen required in its Subcontract that Contract Works: 1) indemnify Paschen with respect to the Jackson Memorial project; and 2) have Paschen named as an additional insured under Contract Works general liability insurance policy. Additionally, the alleged damage to Jackson Memorial occurred during Contract Works ongoing

operations for Paschen. Accordingly, Paschen appears to qualify as an additional insured under the NCIC Insurance Policy. However, an additional insured is also subject to all of the terms and conditions of the NCIC Insurance Policy, which includes the exclusions referenced above.

42. A dispute has arisen and an actual controversy now exists between NCIC and Contract Works and Paschen as to their respective rights and liabilities with respect to the NCIC Insurance Policy. NCIC contends that there is no potential for coverage under the NCIC Insurance Policy as a result of the Independent Contractors Exclusions or any other proper ground as may be determined by the Court. NCIC is informed and believes, and therefore alleges, that Contract Works and Paschen contend to the contrary. Therefore, an actual controversy exists relative to the legal rights, duties and obligations of the respective parties under the NCIC Insurance Policy, which controversy NCIC requests the Court to resolve.

43. A judicial determination is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights, duties and obligations with respect to the NCIC Insurance Policy.

44. Accordingly, NCIC requests a declaratory judgment that the property damage allegedly caused by Contract Works to Jackson Memorial is excluded from coverage under the NCIC Insurance Policy pursuant to the Independent Contractors Exclusions, or any other proper ground as may be determined by the Court.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Judgment)**
**(Against Contract Works and Paschen)**

45. NCIC realleges and incorporates herein by reference, as though set forth in full, paragraphs 1 through 27 of this Complaint.

46. As alleged above, in the Full Application, Contract Works expressly did not allocate any percentage to the box for "Demolition" when requested to indicate the percentage of certain categories of work it performed. Contract Works also check-marked

the box "no" when asked if it had performed demolition during the past three years or intended to do so in the next 12 months.

47. The Restatement (Second) Of Agency § 220 (1958) states that one factor to be considered in determining whether a person is an independent contractor is "whether or not the work is part of the regular business of the employer."

48. To the extent that discovery or further investigation reveals that demolition was a regular part of Contract Works business, and Contract Works statements to the contrary in the Full Application were untrue, NCIC requests a declaratory judgment that the NCIC Insurance Policy is rescinded *ab initio*.

49. To the extent that discovery or further investigation reveals that Contract Works made any other misrepresentations in connection with obtaining the NCIC Insurance Policy, NCIC reserves its rights to seek a declaratory judgment that the NCIC Insurance Policy is rescinded.

50. NCIC hereby offers to restore to Contract Works the premium paid for the NCIC Insurance Policy in conjunction with, or as a condition precedent to, the entry of a declaratory judgment that the NCIC Insurance Policy is rescinded *ab initio*.

WHEREFORE, NCIC prays for judgment as follows:

1. A declaratory judgment that the property damage allegedly caused by Contract Works to Jackson Memorial is excluded from coverage under the NCIC Insurance Policy pursuant to the Independent Contractors Exclusions, or any other proper ground, as may be determined by the Court.

2. A declaratory judgment that the NCIC Insurance Policy is rescinded and *void ab initio* as if it never existed.

3. For costs of suit.

4. For all other relief that the Court deems just and proper.

| | |
|---|---|
| DATED: November 21, 2009 | BUCHALTER NEMER<br>A Professional Corporation<br><br>By:_____<br>JASON E. GOLDSTEIN<br>Attorneys for Plaintiff<br>NATIONAL CONTRACTORS INSURANCE COMPANY, INC., A RISK RETENTION GROUP |